STATE, EX REL. FRANK DOBNEY, APPELLEE, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, APPELLANT.

FILED FEBRUARY 20, 1909. No. 15,469.

1. Carriers: DISCRIMINATION. A railway company so distributed its freight cars that empty cars were ordinarily retained on the division where they had been unloaded until they could be reloaded with outgoing freight. It also preferred shippers of live stock, grain and all kinds of merchandise over the shippers of hay located at noncompetitive points on its railway, and, during a hay blockade at its terminals in Chicago and Omaha, withheld cars for the shipment of hay to other points until the congestion at said terminals was relieved. *Held* an unlawful discrimination against the shippers of hay.

2. ———: SHORTAGE OF FACILITIES: RIGHTS OF SHIPPERS. L. applied to the district court for, and secured, a peremptory writ of mandamus, which directed the railway company to furnish 50 cars, at the rate of at least 5 cars a day for his use. There was a general shortage of cars and locomotives available for the use of the patrons of the carrier, but the railway company had exercised diligence to provide adequate equipment for the transaction of its business. *Held*, That L. was only entitled to a just division of the empty cars that should have been apportioned by defendant to the station where L. was engaged in business.

3. Costs. Although the order of the district court should be reversed, yet, as defendant was in fault to some degree, and it had exclusive possession of the facts which would instruct plaintiff concerning the form of his demand and the limit of his rights, the court in the exercise of its discretion will tax the costs of the proceeding to the carrier.

APPEAL from the district court for Holt county: WILLIAM H. WESTOVER, JUDGE. *Reversed.*

*B. T. White, C. C. Wright* and *B. H. Dunham,* for appellant.

*M. F. Harrington, contra.*

ROOT, J.

Appeal from a judgment of the district court for Holt county peremptorily ordering defendant to furnish empty cars for the use of plaintiff in shipping hay.

1. Defendant argues that the district court did not have jurisdiction to entertain the application of plaintiff, nor to issue a writ to compel defendant to furnish cars, for the reason that the state railway commission, by virtue of sections 10649 *et seq.,* Ann. St., 1907, has exclusive original jurisdiction in the premises. The point has been considered and determined adversely to defendant in *State v. Chicago & N. W. R. Co.,* p. 524, *post.*

2. It is most strenuously argued that to permit the district courts to issue writs in cases like the one at bar will substitute the judgment of courts for that of the managers of railways in the control of the business affairs of the carriers and cause inextricable confusion, to the great detriment not only of the railway company, but the public as well. There is much force in the argument, and, but for our understanding that defendant has discriminated against the shippers of hay in a very considerable section of the state, we would not sustain the district court in any particular. The respondent made a very complete, and, we believe, truthful disclosure of its resources and methods of providing shippers with cars.

It appears that respondent operates 9,000 miles of railway situated in many different states, but forming a connected system. Fifteen hundred miles of said railway are west of the Missouri river. Defendant owns 51,000 box cars and 1,425 locomotives. In five years next preceding the institution of this suit defendant steadily and largely increased the number and capacity of its cars and locomotives. Conditions have been such that from twelve to

eighteen months would intervene between the placing of orders for equipment and the delivery thereof, because of the congested condition of business and the inability of the manufacturers to meet the demands of trade. In the year preceding the hearing respondent had increased its tractive power 26 per cent., and its business for that time had developed 23 per cent. The locomotives and cars of respondent are distributed among the various operating divisions into which its railway is divided, and the apportionment is under the supervision of one man located in Chicago. It is the policy of defendant, as far as practical, to so control traffic that cars unloaded at any particular station or the stations comprising any division are retained at such points or on that division, to be reloaded with merchandise or other property, to be shipped out of that territory, and thereby obviate the movement of empty cars. Defendant's railway west of the Missouri river traverses territory that may, for the purposes of traffic, be separated into divisions of distinct character. The stations on the branches south of the Platte, on the Bonesteel line, and from Norfolk east to the Missouri river, export principally grain, flour, dairy products and live stock. Most of this territory is well settled, and the incoming freight during part of each year fills nearly enough cars to move the outward bound cargoes. From a point some distance west of Norfolk to Long Pine the principal exports are hay and live stock. West of Long Pine great quantities of potatoes are grown and shipped. From the stations further west many range cattle are transported. The country surrounding Stuart, where relator resides, and for a considerable distance in all directions, especially westward, along defendant's railway, is devoted principally to the production of hay. This territory is rather sparsely settled, and the incoming loaded cars furnish but a fraction of those necessary to transport the hay shipped therefrom. No other railway has been constructed near enough to Stuart to compete with respondent, and its monopoly in the matter of transporting the products of that

territory to market is fixed and absolute. About the middle of September the shipment of range cattle commences, and from that date till the early days of November respondent enjoys a remarkable business of that character, aggregating sometimes 600 cars a week. This traffic is largely interstate. To accommodate this business not only cars, but locomotives are sent from defendant's various divisions to the cattle country, with a consequent diminution of facilities for the movement of other freight during that time.

Defendant receives more for the transportation of merchandise, live stock and grain than for the carriage of hay. Because of the bulky character of hay, even when compressed into bales for shipment, it cannot be either loaded or unloaded as expeditiously as the cereals; nor is provision made for its storage in quantities, as in the case of coal, but the supply in any market is augmented continuously, and the demand therefor responds with celerity to any marked increase in the use thereof. Hay, when shipped, is unloaded from the railway team tracks and distributed generally with but little delay to the consumer. Whenever the demand for this article slackens in the cities the team tracks of the various terminals will become congested, and loaded cars devoted to the shipment of hay will remain idle for some time. With this knowledge, defendant has gauged its conduct toward shippers in the hay districts in Nebraska with reference to conditions existing in its Omaha and Chicago terminals, so that, whenever its hay tracks in those cities are filled with loaded cars, it assumes that the same facts exist at all other points where hay might be shipped or consumed, and places an embargo on the traffic, which is not raised until the accumulation of hay in Omaha or Chicago has been greatly reduced. Therefore if a patron desires to ship to markets other than said cities, even though there is an active demand for his product, it is extremely difficult to secure cars for his purpose while said embargo is in force. It also appears that respondent when pressed for cars

gives preference to shippers of merchandise, grain and all kinds of live stock over the dealers in hay. It also appears that from the 1st to the 16th days of October, 1907, both inclusive, there were requests at stations on defendant's Lincoln line for 565 empty freight cars; there were at said stations 264 empty cars and 227 in the process of unloading. During the same time at the stations upon the Superior line 366 cars were demanded; there were 480 empties and 316 were being unloaded. At stations on the Bonesteel line upon said days patrons asked for 906 empty cars; there were 329 empty cars on hand and 439 were being unloaded. At the stations from Norfolk Junction to Long Pine there were calls during said time for 1,739 empty cars; 363 were furnished and 329 were being unloaded. The foregoing figures are the aggregate of daily reports, so that the cars that were reported one day as being unloaded would probably be included in some succeeding day's report of empty cars. It will therefore be noticed that but 35 more empty cars were furnished in 16 days to all of the 20 stations in the 133 miles of road from Norfolk Junction to Long Pine, which includes Stuart, than were unloaded on that division during that time, and that there was a shortage of over 1,300 freight cars at said stations in those 16 days. During that period there was an excess of 120 empties on the Superior line. It is further shown that there has been a shortage of cars for the shipment of hay in September and October in 1904, 1905 and 1906, with like results.

The record fairly warrants a deduction that defendant has employed reasonable diligence to supply itself with equipment to transact its business; that because of the lack of competition it has a monopoly of railway transportation from Stuart and several other like stations in the "hay belt" on its line of railway; that it is more profitable for respondent to have the traffic in hay distributed throughout the year, so that cars used for that purpose may be supplied from freight cars loaded with articles that are shipped into the "hay belt"; that preference is

given shippers of live stock, grain and merchandise over those offering hay for transportation; that in case of a hay blockade on the team tracks in Chicago and Omaha empty cars are withheld and are not supplied to Nebraska hay shippers, without regard to the destination of their consignments; that in case of extreme demand for motive power and empty cars during the range cattle shipping season the "hay belt" is discriminated against as compared with other territory tributary to defendant's railway; that this discrimination is induced by the determination of respondent to handle all of the traffic it can control with the greatest economy in the management of its business and resulting profit to itself; that defendant could have distributed the empty cars under its control in Nebraska in October, 1907, so as to have given relator some relief, and without in any manner interfering with interstate traffic. On the other hand, relator first requested the use of three cars a day, and then, as a foundation for this action, increased his demand to five cars a day until 50 cars were thus supplied, and the order of the trial court is that cars be ordered in that manner. Relator was not entitled, under the circumstances, to all of the relief he demanded. He should have received a just division of the cars that ought to have been apportioned to the station of Stuart, and that number should have been greater than was furnished by defendant. The time has long since passed within which defendant was to comply with the order of the district court, and to affirm the judgment now will not impel the performance of any duty. As defendant was somewhat in fault, and the facts were all in its possession, and but few of them known to plaintiff, it should pay the costs of this case in any event. *State v. Chicago, B. & Q. R. Co.*, 71 Neb. 593; code, sec. 675d.

The judgment of the district court, therefore, is reversed, but a judgment will be entered taxing all of the costs in this court and in the district court to the defendant.

REVERSED.